WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Blake Haines,<br><br>            Plaintiff,<br><br>v.<br><br>Get Air LLC, et al.,<br><br>            Defendants. | No. CV-15-00002-TUC-RM (EJM)<br><br>**REPORT AND RECOMMENDATION** |

      This personal injury action involves a dispute between the Plaintiff, Blake Haines, and the Defendant companies: Get Air, LLC, Quality Foam & Fiber Products, Inc., and Pacific Urethanes, LLC. Haines was injured while performing a flip at Get Air Tucson, an indoor trampoline park, and is now a quadriplegic. Haines alleges Defendant Get Air, LLC produced a defective Employee Handbook ("EH") and supplied the EH to Get Air Tucson. Haines further alleges that Defendant Pacific Urethanes, LLC "negligently and defectively designed, manufactured, tested, marketed and/or labeled" foam that Defendant Quality Foam & Fiber Products, Inc. cut into blocks, which were used at Get Air Tucson. (Doc. 153 at 1). Plaintiff alleges that the foam blocks were defective "in that they failed to meet strength and safety guidelines established by the American Society for Testing and Materials ("ASTM") for use in trampoline court parks." *Id.* at 1–2. Haines' claims against the Defendant companies are based on negligence, products liability, and implied warranties.

Pending before the Court is Defendant Pacific Urethanes, LLC's Motion to Dismiss. (Doc. 103). Pacific alleges that this Court lacks personal jurisdiction over it because its only direct contact with Arizona is selling and delivering product to a single customer in Phoenix. Pacific further alleges that it did not sell or deliver product to Defendant Quality Foam & Fiber in Arizona, and that it had no knowledge or intent that the foam sold to Quality would be cut and re-sold for use at Get Air Tucson. Plaintiff contends that Pacific knew, or reasonably should have known, that its foam would be used in the manner that it was used in connection with Plaintiff's injury, and that Pacific engaged in direct business with Arizona. (Doc. 153). Plaintiff argues that this is enough to support a finding of specific personal jurisdiction.

Pursuant to the Rules of Practice of this Court, this matter was referred to the undersigned for a Report and Recommendation. (Doc. 25).

The motion has been fully briefed by the parties, and the Court finds this matter is suitable for decision without oral argument. For the reasons stated below, the Magistrate Judge recommends that the District Court enter an ordering granting Pacific Urethanes, LLC's Motion to Dismiss.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 8, 2013 Haines was at the Get Air Tucson indoor trampoline park and performed a move where he flipped multiple times off of a platform and into a foam pit. (Doc. 12 at 9). Haines "suffered catastrophic injuries from the maneuver, including fractured cervical vertebrae resulting in paralysis." *Id*. Following this incident, Haines filed suit in Pima County Superior Court on September 5, 2014 against the following defendants: Get Air Tucson, Inc.; Get Air Tucson Trampolines, LLC; Get Air Management, Inc.; Get Air, LLC; Trampoline Parks, LLC; Patti Goodell; Jacob Goodell; Kiersten Goodell; Scott Goodell; Alan McEwan Jr.; Val Iverson, individually and as owner or operator of Trampoline Parks, LLC; Jane and/or John Does #s 1-20; ABC Corporations 1-10; XYZ Partnerships 1-10; and ABC Limited Liability Corporations (LLCs) 1-10. (Doc. 6 Ex. 1). Haines alleged claims for negligence, negligent design,

negligence in safety standards, negligent supervision, negligent hiring and training of personnel, piercing the corporate veil, and punitive damages. *Id*.

On January 5, 2015, Defendant Get Air Tucson Trampolines, LLC removed the case to this Court, alleging all parties were diverse and the amount in controversy exceeded $75,000.00. (Doc. 1 at 1–2). Get Air Tucson Trampolines, LLC stated its removal was timely because it was served on December 6, 2014 and 28 U.S.C. § 1446(b) requires removal within 30 days of service. *Id*. at 2–3. Get Air Tucson Trampolines, LLC did not indicate whether any of the other defendants joined or consented to the removal.

On January 13, 2015, Haines filed a Notice of Filing Amended Pleading Pursuant to LRCiv 15.1(b), averring that no defendant had filed an answer to his original Complaint. (Doc. 8). Haines' First Amended Complaint ("FAC") named Alicia Durfee and Scott Hansen as additional defendants, and alleged Durfee was a manager or supervisor at Get Air Tucson, and Hansen was an employee who was acting as a de facto manager at the time of Haines' injury. (Doc. 12 at 5–6).

On January 23, 2015, Haines filed a Motion to Remand to State Court. (Doc. 17). Haines alleged two arguments in his motion: One, the federal court lacked subject matter jurisdiction because there was not complete diversity among the parties, and two, removal was procedurally improper because the removing party did not establish unanimity among all served defendants for removal. *Id*. at 1–2. Get Air Tucson Trampolines, LLC and the Goodell, Durfee, and Hansen defendants counter argued that Haines' addition of Hansen and Durfee as parties was a "thinly veiled attempt to avoid federal jurisdiction." (Doc. 19 at 1).

Following oral arguments on the Motion to Remand, the Court granted the Motion on April 15, 2015 and remanded this matter back to Pima County Superior Court. (Doc. 31). The Court concluded that the case was improperly removed to federal court because all properly served defendants had failed to join or consent to the removal, and because Haines properly added Hansen and Durfee as defendants in his FAC, which destroyed the Court's diversity jurisdiction.

Following remand, Plaintiff and several defendants entered into a settlement agreement. The Superior Court then dismissed the defendants who were parties to the settlement agreement, leaving two remaining defendants: Get Air, LLC and Quality Foam & Fiber Products, Inc. (Doc. 32 Ex. 3).

On June 12, 2015 Defendant Get Air, LLC removed the case to this Court, alleging that all parties are diverse due to the Superior Court's dismissal of the non-diverse defendants, and that the amount in controversy exceeds $75,000.00. (Doc. 32 at 1–2). Defendant Quality Foam & Fiber Products, Inc. filed a notice consenting to and joining in the notice of removal. (Doc. 35). On July 2, 2015, the Court issued an order directing the Clerk to reopen the case and to recognize Plaintiff's Second Amended Complaint ("SAC") (filed in Superior Court) as the operative complaint in this matter. (Doc. 39).

On July 30, 2015 Defendant Get Air, LLC filed a Motion to Dismiss for lack of personal jurisdiction and failure to state a cause of action pursuant to Fed. R. Civ. P. 8 and Rule 12(b). (Doc. 43). On August 25, 2015 Plaintiff filed a Motion for Leave to Amend Complaint to add and clarify allegations specific to Defendant Get Air, LLC, and to add Pacific Urethanes, LLC as a products liability defendant. (Doc. 45). On February 8, 2016 the District Court entered an Order adopting the undersigned's Report and Recommendation, granting Plaintiff's Motion to Amend and denying Get Air, LLC's Motion to Dismiss as moot. (Doc. 83).

On February 8, 2016 Plaintiff filed his Third Amended Complaint ("TAC"), which names Pacific Urethanes, LLC as an additional products liability defendant. (Doc. 84). The TAC also alleges that Get Air, LLC developed defective safety rules and supplied them to Get Air Tucson.

On March 1, 2016, Defendant Get Air, LLC filed a Motion to Dismiss for lack of personal jurisdiction. (Doc. 97). On February 13, 2017 the undersigned issued a Report and Recommendation recommending that the District Court deny the motion.

On April 15, 2016, Defendant Pacific Urethanes, LLC filed a Motion to Dismiss

for lack of personal jurisdiction. (Doc. 103). Pacific argues that it did not purposefully direct its activities at Arizona nor did the subject litigation arise out of its activities with Arizona such that specific personal jurisdiction over it would be proper. Pacific further argues that it does not have sufficient systematic and continuous business contacts in Arizona to support a finding of general personal jurisdiction. Plaintiff contends that while "there may very well be grounds for general jurisdiction over Pacific, there is abundant evidence to support specific jurisdiction" because Pacific purposefully availed itself of the privilege of conducting business in Arizona and because Pacific knew, or should have known, that its foam would be used in jumping pits in Arizona that directly resulted in Plaintiff's injury. (Doc. 153 at 17).

## II. STANDARD OF REVIEW

To establish a prima facie case for personal jurisdiction, the plaintiff must show that: (1) the forum state's long-arm statute confers jurisdiction over the nonresident defendant; and (2) the exercise of jurisdiction comports with principles of due process. *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). The Arizona long-arm jurisdictional statute provides that this Court "may exercise personal jurisdiction over parties, whether found within or outside this state, to the maximum extent permitted by the Constitution of this state and the Constitution of the United States." Ariz. R. Civ. P. 4.2(a). "Because the [state] Constitution imposes no greater restriction than does the U.S. Constitution, federal courts in [Arizona] may exercise jurisdiction to the fullest extent permitted by due process." *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (citing *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1997)). Thus, the due process analysis under Arizona state law and federal law is the same.

Due process requires that a nonresident defendant have sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations and citation omitted). "[T]he constitutional

1 touchstone of the determination whether an exercise of personal jurisdiction comports
2 with due process remains whether the defendant purposefully established minimum
3 contacts in the forum State." *Asahi Metal Indus. Co. v. Superior Court of California*,
4 *Solano Cty.*, 480 U.S. 102, 108–09 (1987) (internal quotations and citations omitted).
5 "Jurisdiction is proper . . . where the contacts proximately result from actions by the
6 defendant *himself* that create a substantial connection with the forum State." *Id.* at 109
7 (internal quotations and citations omitted) (emphasis in original).

"The party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." *Scott*, 792 F.2d at 927 (citing *Data Disc, Inc.*, 557 F.2d at 1285). "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff is 'obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'" *Scott*, 792 F.2d at 927 (quoting *Amba Marketing Sys., Inc. v. Jobar Int'l, Inc*., 551 F.2d 784, 787 (9th Cir. 1977)); *see also Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "If the district court decides the motion without an evidentiary hearing . . . 'then the plaintiff need only make a prima facie showing of the jurisdictional facts.'" *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). "Uncontroverted allegations in the plaintiff's complaint must be taken as true" and "'[c]onflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). However, "[t]he mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a nonresident defendant." *Chem Lab Products, Inc. v. Stepanek*, 554 F.2d 371, 372 (9th Cir. 1977) (citing *Taylor v. Portland Paramount Corp.*, 383 F.2d 634, 639 (9th Cir. 1967)).

### III. PACIFIC URETHANES, LLC'S MOTION TO DISMISS

Pacific Urethanes argues that Plaintiff has failed to show that this Court has either general or specific personal jurisdiction over it. Pacific alleges that this Court lacks general personal jurisdiction over it because its only direct contact with Arizona is selling

1  and delivering product to a single customer in Phoenix. Pacific further alleges that the
2  Court cannot exercise specific personal jurisdiction over it because Pacific did not sell or
3  deliver product to Defendant Quality Foam & Fiber in Arizona, and it had no knowledge
4  or intent that the foam sold to Quality would be cut and re-sold for use at Get Air Tucson.
5  Plaintiff focuses his argument only on specific jurisdiction and claims that Pacific knew,
6  or reasonably should have known, that its foam would be used in the manner that it was
7  used in connection with Plaintiff's injury, and that Pacific engaged in direct business with
8  Arizona.

### A. Deposition Testimony

Following the filing of Pacific's Motion to Dismiss, the Court granted Plaintiff's Motion to Conduct Jurisdictional Discovery. The parties deposed Darrell Nance, president of Pacific Urethanes; Ron Tatar, independent sales representative for Pacific; Neil Silverman, chemical engineer for Pacific; and Nick George, an employee of Quality Foam & Fiber who was responsible for placing the foam order.

Darrell Nance, former president of Pacific, testified that Pacific began its business in 2012 by manufacturing buns (large blocks of foam) and initially distributed to customers in southern California. (Doc. 153 Ex. 1 at 12–13).[1] In July and August of 2013, Pacific was doing business with Quality in Utah and several companies in Arizona (R&S Mattress, Sherwood, and Arizona Foam). *Id.* at 20:20–21:7. R & S Mattress and Sherwood are mattress manufacturers, and Arizona Foam is a foam fabricator. *Id.* at 35:19–25. Nance stated that most of Pacific's bun customers would modify the foam in some way, such as cutting it up into different shapes and sizes. *Id.* at 22:23–23:4; 36:5–9; 38:10–13. In most cases he does not know specifically what the foam is used for, but he knows Pacific foam was used in furniture, bedding, packaging, and medical applications. *Id.* at 24:4–9; 39:1–9. Nance also knew the foam was used in pole vault pits and jump pits. *Id.* at 39:25; 42:11, 16–21. Nance agreed that when Pacific's customers cut up the

---

[1] Page numbers for the depositions refer to the deposition transcript page numbers, not the CM/ECF page numbers.

- 7 -

foam and use it in different capacities, the foam might be shipped to other locations, including Arizona. *Id.* at 24:21–25:2; 41:12–16. He agreed that Pacific had reason to know that if it sold foam to Quality, it could be cut and resold and used in Arizona. *Id.* at 42:1–4. Nance did not know what Mr. George was going to do with the foam he purchased from Pacific; George never told Nance the foam would be used in trampoline pits. *Id.* at 25:3–11. Nance was never directly aware that Pacific foam would be cut up and used in trampoline parks, and did not know about this use until he learned Pacific was going to be named in this lawsuit. *Id.* at 37:9–12; 40:3–7. Nance testified that he was aware that ASTM standards exist for different kinds of foam products, but that he is not involved in any of the decisions or discussions as to whether a piece of foam complies with a particular ASTM standard. *Id.* at 18:7–14. He did not have any discussions with Mr. Silverman or Mr. Tatar as to whether Pacific foam complied with ASTM F2970-13, and he has never looked up ASTM F2970-13. *Id.* at 20:2–5; 25:12–16. When a customer asked whether a piece of foam complied with a specific ASTM standard, Mr. Silverman would handle that. *Id.* at 21:22–22:8; 25:17–19.

Ron Tatar, independent sales representative for Pacific, testified that his main clients are distributors, "people that buy foam in bulk and then cut it, shape it, fabricate it for a multitude of customers, primarily in the furniture industry," as well as the packaging industry. (Doc. 153 Ex. 2 at 9:18–24). Tatar stated that furniture and bedding are the two main industries that use foam; trampoline foam pits would be "very, very small" and he has "nothing in that industry;" Pacific does do some business with a company that supplies foam for high jump and pole vault pits. *Id.* at 10:3–17. Pacific has a customer, Artistic Coverings, that it sells foam to for sport pits; Artistic Coverings supplies athletic fields nationally, but Tatar does not know which states specifically. *Id.* at 24:10–19. Customers sometimes ask him whether the foam is compliant with a certain ASTM standard. *Id.* at 11:5–11. Tatar agreed that George sent Pacific an email attachment referencing ASTM F2970-13 and inquired whether the foam would meet that standard.

*Id.* at 13:5–12.[2] Tatar did not know that ASTM F2970 applied to trampoline courts. *Id.* at 13:13–17. George asked him to look at Section 11.7 and it said foam pits, and it was very unclear and vague to Tatar what that meant. *Id.* at 13:20–14:1. He thought maybe there was some sort of center with two separate things, a foam pit in one room and a trampoline court in another room, because he knew foam was used in pits for high jumping and pole vaulting. *Id.* at 15:3–10. Section 11.7 says "TC foam pit" but Tatar did not know "TC" meant trampoline court; he did not read Section 11.6, which talks about trampoline courts. *Id.* at 15:13–16:6. Tatar did not follow-up with George to clarify what he meant; he asked George to forward the email to Silverman. *Id.* at 14:3–15. When Tatar emailed George and wrote that "I know for a fact polyurethane foams are used for jumping pit applications," he meant pole vault and high jump pits. *Id.* at 23:5–9. He never knew there was such a thing as trampoline pits, and in his mind, "a trampoline and a pit are two different, separate entities—completely." (Doc. 156 Ex. C at 33:2–4). When Mr. Enos, Pacific's counsel, showed Tatar a video of the trampoline park, he had never seen anything like that before; he "never in a million years" expected to see people jumping off of trampolines into loose foam. *Id.* at 35:20–36:9. When George ordered the foam from Tatar, he did not tell Tatar what it was going to be used for. *Id.* at 30:4–7. George did not mention a trampoline parks company and Tatar did not know that the foam Quality ordered would be used in a trampoline facility. *Id.* at 32:7–15.

Neil Silverman, chemical engineer for Pacific, testified that they don't really know where a lot of the foam their customers purchase ends up because of the competitive nature of the industry. (Doc. 153 Ex. 3 at 14:1–3). The customer knows what it needs and orders the foam without telling Pacific what it will be used for. (Doc. 156 Ex. B at 23:9–

---

[2] *See* Doc. 153 Ex. 4. George sent an email to Tatar asking if the foam Quality ordered would meet the attached specification, 11.7. Tatar responded that the specs were new to him and asked George to forward the email to Silverman. Tatar stated "I do know for a fact that polyurethane foams are used for jumping pit applications but I have never seen these particular requirements." After George forwarded his email to Silverman, Silverman responded that "I am sure it would meet the spec; however, if you want something definitive to protect yourself legally you may want to consider sending it out to get tested."

- 9 -

13). Silverman is a chemist and he formulates the foam to the customer's specifications. (Doc. 153 Ex. 3 at 14:20–25). When Pacific was doing business with Quality, Pacific had no idea that Quality was going to use the foam for trampoline pits; Silverman never heard of a trampoline foam pit until this lawsuit. *Id.* at 20:20–25; Doc. 156 Ex. B at 24:10–14. Silverman stated that George/Quality already had the foam from Pacific when the email chain regarding ASTM F2970 evolved. (Doc. 156 Ex. B at 33:18–19). George sent the email about ASTM F2970 after he ordered the foam and took it to Utah. *Id.* at 34:3–7. When Silverman emailed George that he might want to consider getting the foam tested, Silverman meant that if George "wanted a certification that it would meet this specific ASTM designation, that he would need to get it tested by an outside testing laboratory." *Id.* at 34:17–19. Once a customer cuts the foam into smaller pieces, Silverman can't say if it would meet a certain specification; he can only certify it or state the performance of the foam at the time Pacific ships it. *Id.* at 34:24–35:3. Silverman did not know that ASTM F2970 applied to trampoline courts. (Doc. 153 Ex. 3 at 31:3–6). When customers ask if the foam complies with a certain standard, he just looks at what the customer sent him; he does not pull the entire ASTM spec on his own and review it. *Id.* at 32:20–25.

Nick George, who works for Quality Foam & Fiber, testified that he sent the ASTM F2970-13 spec sheet to Tatar; he does not know who circled "11.7 TC Foam Pit" on the sheet. (Doc. 156 Ex. E at 38:13–18, 38:22–39:3). When asked whether he had communicated to Tatar prior to this email exchange that the foam was going to be used in jumping pits, George stated: "And I'm guessing, but based on this email, we most likely had a phone conversation." *Id.* at 39:18–22. When asked whether he had any reason to believe that Pacific had knowledge that the foam was going to be used in trampoline parks in Tucson, George stated "No, they wouldn't have known." *Id.* at 58:7–12. He had no conversations with Nance, Silverman, or Tatar prior to Plaintiff's injury that the foam Quality purchased from Pacific might be used in trampoline parks in Tucson. *Id.* at 74:1–9. George did not have the foam tested for the ASTM standards as Silverman advised; he explained that Quality does not do any testing, ever; Quality tells its customers that they

need to do third-party testing if they want the foam to meet any standards. *Id.* at 42:11–25.

Exhibit D to Pacific Urethane's Reply in support of its Motion to Dismiss is a copy of the purchase order and invoice for Quality's order. (Doc. 156 Ex. D). It lists several different product codes but does not indicate anything about what the foam will be used for, nor does it reference any ASTM specifications or any other specifications. The invoice from Pacific to Quality is dated July 11, 2013, and the purchase order is dated June 26, 2013. A second invoice from Quality to Trampoline Parks, LLC is dated July 10, 2013. The email chain between George, Tatar, and Silverman is dated July 31, 2013–August 1, 2013. (Doc. 153 Ex. 4).

### B. General Jurisdiction

"A defendant whose contacts with a state are 'substantial' or 'continuous and systematic' can be haled into court in that state in any action, even if the action is unrelated to those contacts." *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). "This is an exacting standard . . . because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger*, 374 F.3d at 801. "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Id.* "It is the nature and extent of the contacts that determines whether they are 'substantial' or 'continuous and systematic.' Longevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets are among the indicia of such a presence." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1172 (9th Cir. 2006). "[E]ngaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders." *Bancroft*, 223 F.3d at 1086. "Put another way, a defendant must not only step through the door, it must also sit down and make itself at home." *Tuazon*, 433 F.3d at 1169 (internal quotations and

citation omitted).

Pacific argues that its limited contacts with Arizona do not equate to a physical presence in the state such that this Court may properly exercise general personal jurisdiction over it. Pacific notes that it "is not licensed to do business in Arizona; it has no office in Arizona; it maintains no sales force in Arizona; it does not advertise in Arizona; it does not pay Arizona taxes and does no banking in the state." (Doc. 103 at 8). In his affidavit, Nance also states that Pacific is not registered to do business in Arizona, has no employees in Arizona, owns no real or personal property in Arizona, and does not purchase supplies or source any products or services in Arizona. (Doc. 103-1 at 1–2 ¶¶ 4–12). Pacific further states that it only supplies product directly to one Arizona customer, R & S Mattress, and that sales to R & S made up 4.5 percent of Pacific's total sales in 2013 and 11.8 percent of total sales in 2015. (Doc. 103 at 8). The sales to R & S Mattress are the only sales that Pacific makes to a customer for delivery in Arizona. (Doc. 103-1 at 2 ¶ 13). While Pacific also makes sales to Sherwood, Arizona Foam, and Tuft & Needle, it claims that these are not Arizona sales and there are no Arizona contracts associated with these sales. (Doc. 103 at 8).[3]

Based on the record before the Court, there is no evidence that Pacific's contacts with Arizona are so substantial, continuous, and systematic to give rise to general jurisdiction. While Pacific does make sales to Arizona companies, "[i]t is abundantly clear that a corporation does not necessarily submit to general jurisdiction in every state in which it merely sells a product." *Tuazon*, 433 F.3d at 1174; *see also Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1226 (9th Cir. 2011) ("'occasional' sales to

---

[3] "In 2013, Pacific Urethanes had two customers (Arizona Foam and Sherwood) who purchased product that Pacific Urethanes believed was destined for Arizona. However, no contracts with these customers were entered into in Arizona and no delivery of product was made by Pacific Urethanes in Arizona; rather, deliveries to these customers were made in Ontario, California." (Doc. 103-1 at 2 ¶ 14).

"Pacific Urethanes sells product to Fosbrooke, Inc., a Delaware corporation doing business as Tuft & Needle (T&N) and having offices in Phoenix, Arizona. . . . T&N provides shipping labels to Pacific Urethanes so product can be shipped directly from Pacific Urethanes' facility to T&N's customers, which are located throughout the U.S., including Arizona." *Id.* at ¶ 15.

forum residents by a nonresident defendant do not suffice to establish general jurisdiction."); *Bancroft*, 223 F.3d at 1086 (distinguishing between "doing business *in* California," which may support a finding of general jurisdiction, and "doing business *with* California," which will not support such a finding) (emphasis added). Further, Plaintiff does not actually argue that this Court has general jurisdiction over Pacific, but rather focuses his argument on specific jurisdiction. Accordingly, the undersigned finds that Pacific's contacts with Arizona do not show the "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets" necessary to support a finding of general jurisdiction over Pacific. *Tuazon*, 433 F.3d at 1172.

**C. Specific Jurisdiction**

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (internal quotations and citations omitted). Analysis of whether the Court has specific jurisdiction over the nonresident defendant requires a three-pronged test:

> (1) The non-resident defendant must purposefully direct [its] activities or consummate some transaction with the forum or resident thereof; or perform some act by which [it] purposefully avails [itself] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). "The plaintiff bears the burden of satisfying the first two prongs two of the test." *Id.* (citation omitted).

i. Purposeful Availment

"In products-liability cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with traditional notions of fair play and substantial justice." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011); *see also*

- 13 -

*Holland America Line Inc. v. Wärtsilä North America, Inc.*, 485 F.3d 450, 460 (9th Cir. 2007) ("[I]t is well established that the *Calder* [purposeful direction] test applies only to intentional torts, not to the breach of contract and negligence claims[.]"); *Mavrix Photo*, 647 F.3d at 1228 (noting that the Supreme Court's plurality in *J. McIntyre* used a purposeful availment test to determine whether specific personal jurisdiction existed in a products liability case.).[4] "Th[e] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). This requirement "is met if the defendant 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)).

"The placement of a product into the stream of commerce, without more, is not an

---

[4] The Ninth Circuit has held that "'[p]urposeful availment' and 'purposeful direction' are distinct tests, the former to be applied to contract claims and the latter to tort claims." *Planning Grp. of Scottsdale, L.L.C. v. Lake Mathews Mineral Properties, Ltd.*, 226 Ariz. 262, 266 (2011). "For contract claims, the Ninth Circuit asks whether the defendant 'perform[ed] some act by which he purposefully avail[ed] himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.'" *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802). "For tort claims, the court considers whether the defendant 'purposefully direct[ed] his activities or consummate[d] some transaction with the forum or resident thereof.'" *Id.* at 267 (quoting *Schwarzenegger*, 374 F.3d at 802). This "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution of goods originating elsewhere." *Schwarzenegger*, 374 F.3d at 803. In *Planning Group of Scottsdale*, the Arizona Supreme Court found that it does not matter whether the plaintiff's claims sound in contract or tort for purposes of determining specific jurisdiction; rather, based on United States Supreme Court jurisprudence, the inquiry is whether "[c]onsidering all of the contacts between the defendants and the forum state, did those defendants engage in purposeful conduct for which they could reasonably expect to be haled into that state's courts with respect to that conduct?" 226 Ariz. at 268.

For intentional torts, purposeful direction is analyzed under the three-part effects test based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984): "[T]he 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (internal quotations and citation omitted). In the present case, Plaintiff's claims against Pacific are based on products liability and negligence; thus, the *Calder* test for intentional torts does not apply.

act purposefully directed toward a forum state." *Holland*, 485 F.3d at 459 (citing *Asahi*, 480 U.S. at 112).[5] "Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state." *Id.* Rather, the plaintiff must allege additional conduct "indicat[ing] an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112; *see also Arizona Sch. Risk Retention Trust, Inc. v. NMTC, Inc.*, 169 F.Supp.3d 931, 939 (D. Ariz. 2016), *appeal dismissed* (May 23, 2016) (citing *J. McIntyre* and *Holland* and noting that the court will focus its analysis on defendant's "efforts directed at Arizona that amount to something more than merely placing its product at issue in the stream of commerce."); *George Kessel Int'l Inc. v. Classic Wholesales, Inc.*, 2007 WL 3208297, at *3 (D. Ariz. Oct. 30, 2007) (finding that plaintiffs failed to allege "additional conduct" by defendant beyond placing a product into the stream of commerce to support a finding of "purposeful direction"). Further, "casual or accidental contacts by a defendant with the forum state, particularly those not directly related to the asserted cause of action, cannot sustain the

---

[5] In *J. McIntyre*, the Supreme Court addressed the confusion that has resulted from the Court's decision in *Asahi* and the "stream of commerce" test for specific jurisdiction. In *J. McIntyre*, the Court cited its opinion in *World-Wide Volkswagen* and noted that "a defendant's placing goods into the stream of commerce 'with the expectation that they will be purchased by consumers within the forum State' may indicate purposeful availment." 564 U.S. at 881–82 (quoting *World-Wide Volkswagen*, 444 U.S. at 298). However, "that statement does not amend the general rule of personal jurisdiction." *Id.* at 882. "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of the sovereign." *Id.* "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* The Court further noted that Justice Brennan's concurrence in *Asahi*, "advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of judicial power. This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id.* at 883.

The Supreme Court also noted that while both *Asahi* and *J. McIntyre* concerned foreign manufacturers, the same principles apply to domestic corporations: "The owner of a small Florida farm might sell crops to a large nearby distributor, for example, who might then distribute them to grocers across the country. If foreseeability were the controlling criterion, the farmer could be sued in Alaska or any number of other States' courts without ever leaving town." *J. McIntyre*, 564 U.S. at 885. Thus, "the authority to subject a defendant to judgment depends on purposeful availment." *Id.*

- 15 -

exercise of specific jurisdiction." *Planning Grp.*, 226 Ariz. at 266.

Here, Pacific correctly notes that Plaintiff cannot meet his burden to show specific jurisdiction "by merely showing that Pacific-manufactured foam was placed into the stream of commerce and made its way to Arizona via circumstances wholly unrelated to any purposeful act by Pacific." (Doc. 103 at 5). However, Plaintiff argues that "[t]here is no dispute Pacific . . . engaged in direct business with Arizona customers" and that "Pacific cannot credibly argue it lacked notice it could be subject to jurisdiction in Arizona" when it has sales totaling millions of dollars to Arizona customers. (Doc. 153 at 10). It is clear that the specific foam at issue here used in the trampoline pit at Get Air Tucson was not sold by Pacific to an Arizona customer. Rather, Pacific sold the foam to Quality Foam & Fiber in Utah, which then sold the foam to Trampoline Parks, LLC in Utah, which then sent the foam to Get Air Tucson. Even if Pacific was aware that the foam it sold to Quality might make its way to Arizona through the stream of commerce, this is not enough to show that Pacific purposefully directed its conduct toward Arizona. However, Pacific does do business with other customers in Arizona. While Pacific claims that these Arizona sales make up only a small portion of its total business, the fact remains that Pacific does sell foam to at least three Arizona companies: R & S Mattress, Sherwood, and Arizona Foam. Nor are these Arizona sales isolated occurrences—Pacific has an ongoing business relationship with each of these customers and has made multiple sales to the Arizona customers over a period of several years. Even if the only sales Pacific made to an Arizona customer for delivery in Arizona were to R & S Mattress (*see* Doc. 103-1 at 2 ¶ 13), this is more than a "random" or "fortuitous" contact and demonstrates "affirmative conduct" by Pacific "'which allows or promotes the transaction of business within the forum state.'" *Harris Rutsky*, 328 F.3d at 1130 (quoting *Sher*, 911 F.2d at 1362). Thus, based on Pacific's Arizona sales, the Court finds that Pacific has purposefully availed itself of the privilege of conducting business in Arizona.

      ii. Pacific's Forum-related Activities

"The second requirement for specific jurisdiction is that the contacts constituting

1  purposeful availment must be the ones that give rise to the current suit." *Bancroft &*
2  *Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000); *see also Harris*
3  *Rutsky*, 328 F.3d at 1129 (The second factor requires that "the claim must be one which
4  arises out of or relates to the defendant's forum-related activities."). The Ninth Circuit
5  uses a "but for" test: "The second prong of the specific jurisdiction test is met if "but for"
6  the contacts between the defendant and the forum state, the cause of action would not
7  have arisen." *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995); *Ballard v.*
8  *Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). In *Shute v. Carnival Cruise Lines*, the Ninth
9  Circuit reasoned that "[t]he 'but for' test is consistent with the basic function of the
10 'arising out of' requirement—it preserves the essential distinction between general and
11 specific jurisdiction. . . . The 'but for' test preserves the requirement that there be some
12 nexus between the cause of action and the defendant's activities in the forum." 897 F.2d
13 377, 385 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991); *see also Walden*,
14 134 S. Ct. at 1121 ("For a State to exercise jurisdiction consistent with due process, the
15 defendant's suit-related conduct must create a substantial connection with the forum
16 State.").

17      Here, Plaintiff cannot show that but for Pacific's contacts with Arizona, Plaintiff's
18 injury would not have occurred. Pacific's Arizona actions did not give rise to the alleged
19 harm, and while Pacific did make sales to Arizona customers, Plaintiff's claims are not
20 based in those Arizona sales. While Plaintiff attempts to argue that Pacific knew its foam
21 would be used in Arizona and knew or had reason to know that the foam would be used
22 specifically in a trampoline jumping pit, the connection here is tenuous at best. The
23 record shows that Pacific had no specific knowledge as to what Quality planned to do
24 with the foam it purchased from Pacific, who Quality planned to sell the foam to, or what
25 state Quality intended to ship the foam to. Nance, Tatar, and Silverman all testified that
26 Nick George from Quality never told them what Quality was going to use the foam for,
27 and further explained that Pacific generally does not know what specific applications its
28 customers use the foam buns for. George confirmed that Pacific would not have known

1  that the foam Quality purchased was going to be used in a trampoline park in Tucson.
2  Nance, Tatar, and Silverman also stated that while they were aware that foam is used in
3  pole vault and high jump pits, they had no idea that foam was also used in trampoline
4  foam pits.

5        While Plaintiff contends that, "prior to purchasing the foam blocks from Pacific,
6  Quality was expressly assured by Pacific that Pacific's foam complied with ASTM safety
7  requirements for use in trampoline courts," the record shows that Quality did not inquire
8  about the ASTM standard until after it had already purchased and received the foam from
9  Pacific. (Doc. 153 at 3).[6] Further, both Tatar and Silverman testified that they did not
10 know ASTM F2970 Section 11.7 applied to trampoline courts, nor did they even know
11 that there was such a thing as a trampoline foam pit until this lawsuit. In addition, in his
12 email to George, Silverman did not state that "Pacific's foam complied with ASTM
13 safety requirements for use in trampoline courts" as Plaintiff claims; rather, Silverman
14 stated that "I am sure it would meet the spec; however, if you want something definitive
15 to protect yourself legally you may want to consider sending it out to get tested." (Doc.
16 153 Ex. 4). Silverman explained that he can only certify the foam at the time Pacific ships
17 it; once a customer takes the foam and modifies it, it is up to the customer to have the
18 foam tested to meet the customer's specific requirements.

19       Plaintiff also argues that "Pacific knew, and purposely contemplated that, its
20 customers would routinely cut up the foam into smaller pieces for use in bedding,
21 furniture and athletic *jumping pits*, across America, and in Arizona." (Doc. 153 at 3)
22 (emphasis in original). Pacific has consistently stated that in most cases, it does not know
23 what the majority of its customers use the foam buns for, but two of the biggest industries
24 are furniture and packaging. Pacific does have some sales to a company called Artistic
25 Coverings, which supplies athletic fields nationally, but Pacific understood that the foam

---

[6] The invoice from Pacific to Quality is dated July 11, 2013, and the purchase order is dated June 26, 2013. A second invoice from Quality to Trampoline Parks, LLC is dated July 10, 2013. The email chain between George, Tatar, and Silverman is dated July 31, 2013–August 1, 2013. (Doc. 153 Ex. 4).

was used for pole vaults and high jump pits, not trampoline pits. Despite Plaintiff's urgings to the contrary, none of the testimony shows that Pacific knew that its foam would be used in trampoline jumping pits in Arizona or any other state.

In sum, the Court cannot find that Plaintiff's injuries would not have occurred but for Pacific's Arizona related activities. *Bancroft* and *Walden* direct the Court to consider the defendant's suit-related conduct to analyze the second prong of specific personal jurisdiction, and here the Court can find none. *See also Echard v. Townsend Farms Inc.*, 992 F. Supp. 2d 958, 962 (D. Ariz. 2014) (finding no specific jurisdiction where "Purely Pomegranate did not retail the allegedly tainted product in Arizona. It did not send the product to the company that retailed it in Arizona. Instead, it shipped the ingredients to the company that sold the product to the company that retailed the product in Arizona. Absent factual allegations establishing a prima facie case that Purely Pomegranate did "something more" to avail itself of the benefits and protections of Arizona's laws—and that Echard's injury arises from the forum-related activities—it is not subject to personal jurisdiction here."). Plaintiff has failed to satisfy the second prong of the specific jurisdiction test.

### iii. Reasonableness

Because Plaintiff has failed to show that his claims arise out of or relate to Pacific's Arizona related activities, the Court need not analyze the remaining element of the specific jurisdiction test. *See Schwarzenegger*, 374 F.3d at 802 ("If the plaintiff fails to satisfy either of [the purposeful availment or arising out of] prongs, personal jurisdiction is not established in the forum state.").

**IV. RECOMMENDATION**

Accordingly, the Magistrate Judge RECOMMENDS that the District Court enter an order GRANTING Pacific Urethane, LLC's Motion to Dismiss. (Doc. 103).

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen days after being served

with a copy thereof. Fed. R. Civ. P. 72(b). No reply to any response shall be filed. *See id*. If objections are not timely filed, then the parties' rights to de novo review by the District Court may be deemed waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 23rd day of February, 2017.

Eric J. Markovich
United States Magistrate Judge