**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Blake Haines,<br><br>        Plaintiff,<br><br>v.<br><br>Get Air LLC,<br><br>        Defendant. | No. CV-15-00002-TUC-RM (EJM)<br><br>**ORDER** |

Pending before the Court is Defendant's Motion to Preclude Testimony of Anthony Gamboa. (Doc. 284.)[1] The Motion is fully briefed. (Doc. 296.) The Court held a *Daubert* hearing on June 27, 2019. (Doc. 317.)

**I.**     *Daubert* **Hearing—Testimony of Robert Taylor**

Three days before the *Daubert* hearing, Defendant filed a document titled "Daubert Hearing Brief" (Doc. 315), which contained a request to present testimony by vocational economist Robert Taylor by videoconference at the *Daubert* hearing. Mr. Taylor has been precluded from testifying at trial based on untimely expert disclosure. (Doc. 264.) The Court is aware of at least one district court that has found that Federal Rule of Civil Procedure 26(a) does not require the timely disclosure of an expert report if a party seeks to use the expert only to support a *Daubert* motion but does not intend to call the expert as a witness at trial. *See Yakima Valley Mem. Hosp. v. Wa. State Dep't of Health*, No. CV-09-3032-EFS, 2012 WL 12951705, at *2 (E.D. Wa. May 18, 2012). However, here,

---
[1] Also pending is Plaintiff's Rule 60 Motion for Relief from Order (Doc. 319), which will be resolved separately.

Defendant was not diligent in timely presenting its request to offer Mr. Taylor's testimony by videoconference. Furthermore, allowing Mr. Taylor to testify would cause unfair prejudice to Plaintiff, who did not have the opportunity to depose Mr. Taylor during discovery. Although such prejudice could be alleviated by reopening discovery to allow Plaintiff to depose Mr. Taylor, Defendant has not shown the requisite diligence to justify modifying the Court's Scheduling Order to reopen discovery. *See* Fed. R. Civ. P. 16(b)(4). Furthermore, reopening discovery would cause significant delays in this case, which has been pending since 2015 and which has a firm trial date scheduled. Finally, the Court has reviewed Mr. Taylor's report and, based on the contents of that report, the Court does not find that Mr. Taylor's testimony would assist the Court in resolving Defendant's *Daubert* motion. (Doc. 315-1.) Accordingly, the Court will not re-open the *Daubert* hearing to hear testimony by Mr. Taylor.

**II.** ***Daubert* Motion**

**A. Legal Standard**

Admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule requires the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589 (1993). To do so, the court must assess "whether the reasoning or methodology underlying the testimony" is valid and "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This gatekeeping function applies not only to expert testimony based on "scientific" knowledge but also expert testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-49 (1999). Its purpose is to ensure "that

an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Factors relevant to the reliability of expert testimony include, but are not limited to, whether the theory or technique used by the expert "can be (and has been) tested," whether it "has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards controlling the technique's operation," and the degree of acceptance in the relevant community of expertise. *Daubert*, 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 149-50. Rule 702's "helpfulness" standard requires that expert testimony be relevant to issues in the case and that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591. An expert's opinions may not be premised on "subjective belief or unsupported speculation." *Id.* at 590 (internal quotation marks omitted).

**B. Background**

Anthony M. Gamboa Jr., Ph.D., M.B.A., describes himself as a vocational economic analyst. (Transcr. 7/5/19 hearing at 35.) According to Dr. Gamboa, a vocational economic analyst assesses lost earning capacity by defining an individual's pre-injury earning capacity, pre-injury work-life expectancy, post-injury earning capacity, and post-injury work-life expectancy, and then calculating the present value of the loss in earning capacity. (*Id.*) In contrast, a vocational rehabilitation expert assesses lost earning capacity by interviewing the injured individual, assessing the individual's capabilities, assessing the job market, determining what jobs the individual is capable of performing, and determining which accommodations would allow the individual to perform those jobs. (*Id.* at 9.)

Dr. Gamboa obtained a B.S. degree in education from the University of Massachusetts at Boston in 1966, a M.Ed. degree in guidance and counseling from Miami University in 1967, and a Ph.D. in guidance and counseling from Ohio State University in 1971. (Doc. 284-1 at 2-3; *see also* Transcr. 7/5/19 hearing at 39-40.) In 1981, 1987, 1990, and 1993, he completed postdoctoral studies in vocational rehabilitation counseling,

economic assessment of earnings, and labor economics. (Doc. 284-1 at 2; *see also* Transcr. 7/5/19 hearing at 27-29, 40-41.) In 1993, he obtained his M.B.A. from the University of Chicago. (Doc. 284-1 at 2; *see also* Transcr. 7/5/19 hearing at 29, 41).

In 1977, Dr. Gamboa formed a company specializing in vocational economic analysis called Present Vocational Economics, Inc. (*See* Doc. 284-1 at 3; Transcr. 7/5/19 hearing at 41.) He has worked as an analyst for that company ever since. (Doc. 284-1 at 3.) He was also on contract with the U.S. Department of Health and Human Services, Social Security Administration, Bureau of Hearings and Appeals from 1977 to 1992. (*See* Doc. 284-1 at 3; Transcr. 7/5/19 hearing at 41.) He has provided expert testimony in the area of vocational economic analysis over a thousand times. (Transcr. 7/5/19 hearing at 41.) His curriculum vitae lists 168 publications and presentations. (Doc. 284-1 at 4-18.)

Dr. Gamboa uses data from the American Community Survey ("ACS") to create work-life expectancy tables—known as Gamboa-Gibson tables—which he sells to approximately 100-150 people per year. (Transcr. 7/5/19 hearing at 3, 28-30.) The ACS is the largest annual survey in the United States, with a sample size of around five million persons per year. (Doc. 296-1 at 10; Transcr. 7/5/19 hearing at at 2.) It is administered, controlled, and published by the U.S. Census Bureau. (Doc. 296-3 at 6.) Millions of people use ACS data for a variety of reasons. (Transcr. 7/5/19 hearing at 10.) Dr. Gamboa uses ACS data pertaining to earnings and employment; that data has a sample size of 3.5 million people. (*Id.* at 2-3.) Dr. Gamboa testified that he and many others believe that the ACS survey provides the best data set for determining lost earning capacity suffered by severely disabled individuals, because the survey is the most comprehensive and has the largest sample size short of the decennial census. (*Id.* at 36.) Due to the large sample size, the ACS data has high validity and reliability. (*Id.* at 7, 12.) Dr. Gamboa further testified that ACS respondents are categorized as disabled if they affirmatively respond that they have problems with lifting, carrying, or walking. (*Id.* at 6; *see also* Doc. 296-1 at 11-12.)[2] They

---

[2] In his report, Dr. Gamboa indicates that, prior to 2008, ACS respondents were asked if they had a long-lasting condition "that substantially limits one or more basic physical activities such as walking, climbing stairs, reaching, lifting, or carrying." (Doc. 296-1 at 11.) After 2008, ACS respondents were asked if they "have serious difficulty walking or

- 4 -

are categorized as non-severely disabled if they respond affirmatively only to that question; they are categorized as severely disabled if they also respond affirmatively that they have problems with self care. (Transcr. 7/5/19 hearing at 6; *see also* Doc. 296-1 at 11-12.)

Dr. Gamboa authored a lost-earning-capacity report in this case on July 19, 2017. (Doc 296-1.) He calculated Plaintiff's lost earning capacity by using Plaintiff's age, gender, education level, and severity of disability. (Transr. 7/5/19 hearing at 4-5.) He started the analysis on Plaintiff's 28th birthday, which is in March 2021. (*Id.* at 5.) Prior to authoring the report, he spoke to Plaintiff for about 30-45 minutes and learned that Plaintiff is intelligent, was almost the valedictorian of his high school, and is currently taking college classes. (*Id.* at 24-25.) Dr. Gamboa's interview with Plaintiff influenced his opinion that Plaintiff will achieve a baccalaureate degree or higher level of education. (*Id.*) Dr. Gamboa concluded that, given the severity of Plaintiff's disability, Plaintiff's best shot at obtaining employment is to achieve a graduate degree, which is Plaintiff's goal. (*Id.* at 4.)

Dr. Gamboa opined that, according to ACS data, a non-disabled male in Plaintiff's age and education group earns approximately $110,000 per year and a severely disabled male in the same age and education group earns approximately $90,000 per year—a difference of $20,000 per year. (Doc. 296-1 at 4; Transcr. 7/5/19 hearing at 18-19.) In addition, Dr. Gamboa opined that Plaintiff's work-life expectancy was reduced from a normal range of 35.1 years to 13.1 years, beginning from age 28. (Doc. 296-1 at 5; Transcr. 7/5/19 hearing at 19.) To reach his opinion concerning Plaintiff's work-life expectancy, Dr. Gamboa used ACS data as well as life expectancy data from the National Vital Statistics Reports, Volume 66, Number 8, United States Life Tables, National Center for Health Statistics. (Transcr. 7/5/19 hearing at 21-23.) The life-expectancy data pertains to all males, the vast majority of whom have no disability. (*Id.* at 18.) The ACS data show that severely disabled individuals leave the labor market much earlier than their non-disabled counterparts. (*Id.* at 21-22.) At age 28, severely disabled males with a

---

climbing stairs." (*Id.* at 12.)

baccalaureate degree or greater have an employment level of 42.5%, and the employment levels drop off thereafter. (*Id.* at 7, 21-22; *see also* Doc. 296-1 at 43-44.)

In total, Dr. Gamboa opined that the present value of Plaintiff's lost earning capacity is $3,409,973. (Doc. 296-1 at 2, 5.) Although Dr. Gamboa calculated Plaintiff's lost earning *capacity*, he did not calculate any lost earnings, because Plaintiff had very little employment prior to his injury. (Transcr. 7/5/19 hearing at 33.)

**C. Discussion**

GALLC seeks to preclude Dr. Gamboa's testimony pursuant to Federal Rules of Evidence 402 and 702, *Daubert*, and *Kumho Tire*. (Doc. 284 at 1.) GALLC argues, first, that Dr. Gamboa is unqualified to offer expert opinions on Mr. Haines's lost income or the present value of Mr. Haines's future medical care. (*Id.* at 2-4.) In support of this argument, GALLC takes issue with the characterization of "postdoctoral studies" in Dr. Gamboa's curriculum vitae. (*Id.*) According to GALLC, Dr. Gamboa inaccurately uses the term "postdoctoral studies" to refer to any university class that he enrolled in after receiving an unrelated Ph.D. in guidance and counseling. (*Id.*) GALLC also argues that Dr. Gamboa's opinions concerning lost future earnings are unreliable and insufficiently tailored to Mr. Haines's injuries or life circumstances. (*Id.* at 4-6.)

Mr. Haines responds that Dr. Gamboa is well-qualified and has extensive experience testifying as an expert in district and state courts across the nation. (Doc. 296 at 3.) Mr. Haines also argues that Dr. Gamboa considered all of Mr. Haines's disabilities and projected future needs in developing his opinions, and that his methodology will provide the jury with a rational standard for evaluating Mr. Haines's lost earnings and medical-care costs. (*Id.* at 3-4.)

GALLC's Motion will be denied. Although GALLC is correct that Dr. Gamboa's B.S., Me.D., and Ph.D. degrees are unrelated to his current work, and that post-doctoral study is not equivalent to a post-doctoral appointment, the Court nevertheless finds that Dr. Gamboa is qualified through education and experience to present expert testimony on Mr. Haines's projected lost earnings and the present value of Mr. Haines's future medical care.

Dr. Gamboa has taken relevant high-level courses and has an M.B.A. from the University of Chicago. In addition, he has decades of relevant experience and dozens of relevant publications. Dr. Gamboa's education and experience sufficiently qualify him to calculate the present value of future medical care and to opine on lost earning capacity. *See, e.g.*, *State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1106 (D. Kan. 2014) (finding Dr. Gamboa qualified to provide expert testimony concerning loss of earning capacity and present value of future medical treatment).

After consideration of the parties' briefs (Docs. 284, 296), counsel's statements at oral argument, Dr. Gamboa's July 19, 2017 lost-earning-capacity report (Doc. 296-1), his affidavit (Doc. 296-3), and his testimony at the *Daubert* hearing (Doc. 318), the Court also finds that Dr. Gamboa's lost-earnings testimony is sufficiently relevant and reliable for purposes of Rule 702, *Daubert*, and *Kumho Tire*. First, Dr. Gamboa has specialized knowledge that will help the trier of fact to estimate Plaintiff's lost earning capacity. Fed. R. Evid. 702(a). Defendant does not appear to dispute that expert testimony on lost earning capacity would be useful to the trier of fact.

Second, Dr. Gamboa's "testimony is based on sufficient facts or data." Fed. R. Evid. 702(b). Dr. Gamboa relied upon specific information regarding Plaintiff as well as reliable data sources. Although Defendant criticizes the ACS data relied upon by Dr. Gamboa, it fails to point to any more reliable data set that Dr. Gamboa should have used. Defendant argues that Dr. Gamboa's use of ACS data lumps Plaintiff in with a wide variety of individuals who may affirmatively respond to having problems with self-care. However, Defendant concedes that Plaintiff—a quadriplegic—is severely disabled. The fact that the ACS data may include individuals less disabled than Plaintiff indicates that Dr. Gamboa's approach could result in an underestimation of Plaintiff's lost earning capacity, but it does not render Dr. Gamboa's approach unreliable to the point of being inadmissible under Rule 702. Furthermore, to the extent that Defendant is arguing that Dr. Gamboa's testimony is inadmissible because Dr. Gamboa did not review records to confirm Plaintiff's educational history and current college courses, Defendant has not presented evidence contradicting

the information that Dr. Gamboa obtained during his interview of Plaintiff.

Third, the Court finds that Dr. Gamboa's "testimony is the product of reliable principles and methods." Fed. R. Evid. 702(c). Although Defendant has shown that Dr. Gamboa's methodology differs from that employed by vocational rehabilitation experts in social security cases, Defendant has not shown that the methodology employed by such vocational rehabilitation experts is the only reliable methodology for calculating lost earning capacity. Defendant points to economist Thomas R. Ireland's Journal of Legal Economics article criticizing Dr. Gamboa's methodology. (Transcr. 7/5/19 hearing at 13-15.) Although Dr. Gamboa's approach is not immune to criticism and may not be universally accepted in the relevant community, the Court finds that Plaintiff has adequately shown that experts in Dr. Gamboa's field would reasonably rely on the data and methodology used by Dr. Gamboa. (*See, e.g.*, Doc. 296-3 at 7-8, 53-55.)

Finally, the Court finds that Dr. Gamboa reliably applied his principles and methods to the facts of this case. Fed. R. Evid. 702(d). The Court disagrees with Defendant's argument that Dr. Gamboa failed to consider Plaintiff's unique characteristics, such as his driven nature. To the contrary, Dr. Gamboa considered Plaintiff's drive, intelligence, and educational goals in opining that Plaintiff will likely achieve a baccalaureate or higher level of education. He also considered other specific characteristics, such as Plaintiff's age, gender, and injury severity, in reaching his lost-earning-capacity opinion. The Court rejects Defendant's contention that Dr. Gamboa's opinion is irrelevant because it is insufficiently tailored to Plaintiff's circumstances.

Defendant relies upon *Toor v. Homegoods, Inc.*, a case in which Dr. Gamboa was precluded from testifying. Civ. No. 16-1132, 2018 WL 901720 (D.N.J. Feb. 15, 2018). In that case, Dr. Gamboa's opinions—relying upon statistical averages—was found to not be a reasonable measure of damages for the plaintiff because evidence in the case showed that the plaintiff, following his injury, continued working in his same profession as a software engineer and had in fact received a promotion. *Id.* at *3. In contrast, in the present case, Plaintiff has no current employment or prior earnings history which could be used to

calculate a more accurate lost-earnings figure. The trier of fact in the present case is tasked with predicting—without the benefit of prior work and earnings histories—what Plaintiff's future earning potential could have been absent injury and what it will be post-injury. Although generalized community data was found to be insufficiently tailored to the facts in *Toor*, here there are few facts beyond generalized data from which the trier of fact can accomplish the task of calculating Plaintiff's lost earning capacity. Dr. Gamboa appropriately considered the available facts of this case combined with generalized data. *See, e.g.*, *Milne v. Volkswagen AG*, No. 2:05-cv-323, 2009 WL 10702722, at *6 (D. Vt. Jan. 22, 2009) (denying motion to exclude lost-earning-capacity testimony of Dr. Gamboa where plaintiff was a full-time student at the time of the accident with little prior employment history).

Plaintiff's concerns regarding Dr. Gamboa's opinions and methodology are appropriate for cross-examination, but they do not show that Dr. Gamboa's testimony is inadmissible under Rule 402, Rule 702, *Daubert*, and *Kumho Tire*.

**IT IS ORDERED** that Defendant's Motion to Preclude Testimony of Anthony Gamboa (Doc. 284) is **denied**.

Dated this 31st day of July, 2019.

_____
Honorable Rosemary Márquez
United States District Judge